**Jean DEHAINAUT, et al., Plaintiffs–Appellants,**

v.

**Federico PENA, et al., Defendants– Appellees.**

No. 93–3649.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided Aug. 9, 1994.

---

Phillip S. Wood, Richard J. Johnson (argued), Wood & Johnson, Aurora, IL, for plaintiffs-appellants.

Deborah A. Hill (argued), Office of U.S. Atty., Civ. Div., Appellate Section, James B. Burns, Office of U.S. Atty., Thomas P. Walsh, Asst. U.S. Atty., Office of U.S. Atty., Civ. Div., Chicago, IL, for defendants-appellees.

Before BAUER and FLAUM, Circuit Judges, and GRANT, District Judge.*

FLAUM, Circuit Judge.

A group of former air traffic controllers who had been fired for their participation in a 1981 strike against the federal government filed a class action suit against the United States Department of Transportation ("DOT"), the Federal Aviation Administration ("FAA"), and the Office of Personnel Management ("OPM"), seeking mandamus and injunctive relief (including back pay) and a declaratory judgment that OPM's policy indefinitely barring them from employment with the FAA and related agencies was unconstitutional. In their four-count complaint, the plaintiffs alleged that the policy violated the Constitution as (1) a bill of attainder, (2) an *ex post facto* law, (3) a denial of due process, and (4) a denial of equal protection. The district court granted the defendants' motion to dismiss under Fed.R.Civ.P. 12(b). We affirm.

## I.

This case has its genesis in the Professional Air Traffic Controllers Organization ("PATCO") strike of August, 1981. *See generally Professional Air Traffic Controllers Organization v. Federal Relations Authority,* 685 F.2d 547, 551 (D.C.Cir.1982). At the time of the strike (and still today), a federal statute provided that "[a]n individual may not accept or hold a position in the Government of the United States" if he "participates in a strike, or asserts the right to strike against the Government of the United States." 5 U.S.C. § 7311. Though the statute was phrased in absolute terms, a regulation provided:

When a person is disqualified for any reason named in § 731.202, OPM, in its discretion, may deny that person examination for and appointment to a competitive position for a period of not more than 3 years from the date of determination of disqualification. On expiration of the period of debarment, the person who has been debarred may not be appointed to any position in the competitive service until his fitness for appointment has been redetermined by OPM.

* The Honorable Robert A. Grant of the Northern     District of Indiana is sitting by designation.

5 C.F.R. § 731.303. Among the many reasons for disqualification listed in 5 C.F.R. § 731.202(b) was "[a]ny statutory disqualification which makes the individual unfit for the service"—such as that provided by 5 U.S.C. § 7311.

On the first day of the strike, President Reagan issued an ultimatum to the striking controllers: return to work within forty-eight hours or forfeit your job. *See* 17 Weekly Comp.Pres.Doc. 845 (Aug. 3, 1981). Plaintiffs were among those discharged for failing to return to work. Shortly thereafter, the OPM announced that it intended to apply the maximum three-year debarment to the controllers. On December 9, 1981, however, President Reagan issued a directive modifying the debarment policy. The President's letter read as follows:

The Office of Personnel Management has established the position that the former air traffic controllers who were discharged for participating in a strike against the government initiated on August 3, 1981 shall be debarred from federal employment for a period of three years. Upon deliberation I have concluded that such individuals, despite their strike participation, should be permitted to apply for federal employment outside the scope of their former employing agency.

Therefore, pursuant to my authority to regulate federal employment, I have determined that the Office of Personnel Management should permit federal agencies to receive applications for employment from these individuals and process them according to established civil service procedures. Your office should perform suitability determinations with respect to all such applicants according to established standards and procedures under 5 CFR, Part 731. After reviewing reports from the Secretary of Transportation and the Administrator of the Federal Aviation Administration, I have further determined that it would be detrimental to the efficiency of operations at the Federal Aviation Administration and to the safe and effective performance of our national air traffic control system to permit the discharged air traffic controllers to return to employment with that agency. Therefore, these former federal employees should not be deemed suitable for employment with the Federal Aviation Administration.

I direct you to process their applications for reemployment with the federal government accordingly.

17 Weekly Comp.Pres.Doc. 1364 (Dec. 9, 1981). On January 6, 1982, OPM issued Federal Personnel Manual (FPM) Bulletin 731–6 which implemented the policy announced in the December presidential directive. Bulletin 731–6 stated in relevant part:

All persons whose employment was terminated on account of the strike by air traffic controllers, which began on or about August 3, 1981, shall be determined not to be suitable for reinstatement or appointment in any position in the FAA, because it would be detrimental to the efficiency of that agency by interfacing with or preventing its effective performance of its duties and responsibilities (5 CFR 731.202(a)(2)).

The Office of Personnel Management shall consider, on a case-by-case basis, applications for Federal employment, other than in the FAA from air traffic controllers whose employment was terminated on account of striking, and shall make appropriate determinations of their suitability for the particular department for which they apply. . . .

Even after the issuance of Bulletin 731–6, plaintiffs allege that the FAA, in response to inquiries, continued to inform fired strikers that they still would be eligible for reemployment with the FAA three years after the date of their termination. This apparent contradiction was resolved, however, by the March 1984 publication of a new bulletin,[1] which, according to the plaintiffs, reinterpreted the December 1981 presidential directive in the wake of election-year polls indicating approval of the President's handling of the PATCO strike. The new bulletin stated that "the debarment period imposed by the Presi-

---

1. The new bulletin expired on January 20, 1985, at which time it was reissued (contents un- changed) as FPM Bulletin 731–9, with an expiration date of October 20, 1986.

dent against reemployment of discharged controllers within the scope of the FAA is *indefinite in duration* and extends to positions in the FAA *and closely related facilities."* (emphasis added).

■ After the three-year anniversary of their termination, the OPM received employment applications from various fired controllers, but declined to perform suitability determinations. Instead, the OPM applied the indefinite debarment policy articulated in the aforementioned FPM Bulletins. Plaintiffs filed suit, alleging that OPM's policy violated the Constitution as (1) a bill of attainder; (2) an *ex post facto* law; (3) a denial of due process; and (4) a denial of equal protection. In essence, plaintiffs claim that OPM misinterpreted and misapplied President Reagan's directive by failing to reevaluate the suitability for reemployment with the FAA at the end of the three-year maximum period of debarment.[2] The district court dismissed plaintiffs' complaint in its entirety, apparently under Fed.R.Civ.P. 12(b)(6).[3] Our review of a dismissal under Rule 12(b)(6) is *de novo, Northwest Tissue Center v. Shalala,* 1 F.3d 522, 527 (7th Cir.1993), and we must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the light most favorable to the plaintiffs. *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). For the reasons stated below, we affirm the judgment of the district court.

## II.

### A.

■ Article I, § 9, clause 3 of the United States Constitution prohibits Congress from passing bills of attainder. The Supreme Court has defined a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Service System v.*

*Minnesota Public Interest Research,* 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632 (1984); *see also Schellong v. I.N.S.,* 805 F.2d 655, 662 (7th Cir.1986), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 199 (1987). Thus, it is apparent that a bill of attainder consists of three elements: (1) specification of the affected persons; (2) punishment; and (3) lack of a judicial trial.

As the Supreme Court has noted on numerous occasions, the Bill of Attainder Clause "is an important ingredient of the doctrine of separation of powers," *see e.g., United States v. Brown,* 381 U.S. 437, 442–43, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484 (1965), that historically was viewed as a limitation on the power of the legislature alone. *See generally, Nixon v. Administrator of General Services,* 433 U.S. 425, 473–75, 97 S.Ct. 2777, 2805–06, 53 L.Ed.2d 867 (1977); L. Tribe, *American Constitutional Law* 660 (1988). "Just as Art. III confines the Judiciary to the task of adjudicating concrete 'cases or controversies,' so too the Bill of Attainder Clause was found to 'reflect ... the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.'" *Nixon,* 433 U.S. at 469, 97 S.Ct. at 2803 (quoting *Brown,* 381 U.S. at 445, 85 S.Ct. at 1713). Thus, our first inquiry is whether the very nature of the action challenged here—an executive agency's interpretation of a presidential directive—places it outside the reach of the ban on bills of attainder.

■ The district court thought so, concluding that the clause did not apply "[b]ecause OPM's indefinite disbarment policy is an executive action." Mem. Op. at 8 (citations omitted). Although the district court may be correct, the Supreme Court has not directly ruled either way on the applicability

---

**2.** While President Clinton's lifting of the indefinite debarment policy has mooted plaintiffs' prayer for injunctive relief, their additional claims for back pay and attorney's fees remain before this court.

**3.** Defendants raised a number of arguments for dismissal, including lack of jurisdiction, *res judi-*

*cata,* and failure to state a claim. The district court referred to the defendants' motion simply as a "Rule 12(b) motion", but did not find the suit barred by either jurisdictional defects or *res judicata.* Accordingly, we treat the dismissal as having been for failure to state a claim.

of the attainder ban to actions of executive and administrative agencies, and an argument can be made for analyzing each case functionally rather than structurally. *See Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 143, 71 S.Ct. 624, 634, 95 L.Ed. 817 (1950) (Black, J., concurring) ("It is true that the classic bill of attainder was a condemnation by the legislature following investigations by that body, ... while in the present case the Attorney General performed the official tasks. But I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."). In *Rodriguez v. United States Parole Com'n,* 594 F.2d 170, 174 (7th Cir.1979), we stated that an administrative rule adopted pursuant to Congressionally delegated authority must be viewed as tantamount to a statute for the purpose of determining whether it runs afoul of the *ex post facto* clause, a constitutional provision that, like the ban on bills of attainder, protects settled expectations against subsequent shifts in political winds. Having gone this far, it is a conceivable step to also view an agency policy interpreting the language of a presidential directive issued pursuant to statutory authority, *see* 5 U.S.C. § 3301, as the functional equivalent of a legislative enactment for bill of attainder purposes. We need not decide today whether we ought to take such a step because assuming, without deciding, that the clause applies to this case, we find that OPM's action is not "punishment" as that term has been defined in the context of bills of attainder.

In testing for bills of attainder, the Court has not applied a generic definition of the term "punishment". As Justice Frankfurter explained in *United States v. Lovett:*

> The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise might be enjoyed But there may be reasons other than punitive for such deprivation.

328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252 (1946) (Frankfurter, J., concurring). Thus, in view of the complexity inherent in characterizing governmental action and the multiple purposes of "punishment", the Court has employed a three-pronged test for determining whether a particular enactment inflicts punishment: (1) does it fall within the historical meaning of legislative punishment? (2) when viewed in terms of the type and severity of burdens imposed, can it reasonably be said to further nonpunitive legislative purposes? and (3) does the legislative (or, here, administrative) record evince an intent to punish? *Selective Service,* 468 U.S. at 852, 104 S.Ct. at 3355; *Nixon,* 433 U.S. at 473, 475–76, 97 S.Ct. at 2806–07.

As the *Nixon* Court recognized, "[o]ur country's own experience with bills of attainder" has resulted in the addition of "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations" to the list of historically impermissible punishments. 433 U.S. at 474, 97 S.Ct. at 2806 (citing *Cummings v. Missouri,* 4 Wall. 277, 18 L.Ed. 356 (1867); *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); *Brown, supra*) (parentheticals omitted). Because plaintiffs allegations fit comfortably within this description, we find the first prong of the test satisfied.

■ This is not nearly enough, however. Even where a fixed identifiable group—such as the fired controllers—is singled out and a burden traditionally associated with punishment—such as permanent exclusion from an occupation—is imposed, the enactment may pass scrutiny under bill of attainder analysis if it seeks to achieve legitimate and nonpunitive ends and was not clearly the product of punitive intent. *See* Tribe, *supra* at 654 n. 13, 655 & 656 n. 18. Put differently, "[t]he question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profes-

sion." *DeVeau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960) (Frankfurter, J.). In *DeVeau*, the Court upheld a New York statute which disqualified convicted felons from serving in any office in a waterfront labor organization, noting that the statute's purpose was "not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony." *Id.* Similarly, in *Schellong*, this court upheld two statutory provisions—one requiring that persons who participated in Nazi persecution be deported and the other eliminating the Attorney General's discretionary power to grant such persons relief from deportation—against a bill of attainder challenge. 805 F.2d at 662. We concluded that "[t]he purpose of these statutes is not to punish individuals for actions previously taken, but to ensure that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people." *Id.* Here, as in *DeVeau* and *Schellong*, President Reagan's directive, as interpreted and applied by OPM, was explained as a nonpunitive, prophylactic measure "to protect the efficiency of the FAA's operations" and "the safe and effective performance of the nation's air traffic control system." 17 Weekly Comp.Pres.Doc. 1364 (Dec. 9, 1981). A comparison of the instant case with *Cummings v. Missouri* illustrates this point. In *Cummings*, the Supreme Court struck down a provision of the post-Civil War Missouri Constitution that barred persons from certain professions unless they stated under oath that the never had been associated with the Confederacy. *See* 4 Wall. at 324–325. As the *Cummings* Court noted, the required oath had no connection to the determination of a person's qualifications for a particular profession. *Id.* at 319–320. Here, by contrast, we find an adequate nexus between the restriction imposed and the legitimate governmental purpose. President Reagan determined that the intermingling of controllers who had been fired for striking with those who had re-

placed them would interfere with the safety and efficiency of the FAA's operations.

Our final inquiry into whether the challenged enactment inflicts punishment is whether the legislative (or, here, administrative) record as a whole evinces an intent to punish. *See Nixon*, 433 U.S. at 478–84, 97 S.Ct. at 2808–10 (examining the terms of the enactment and related committee reports and legislative history to determine the issue of intent); *see also Selective Service*, 468 U.S. at 855 n. 15, 104 S.Ct. at 3356 n. 15; (same). The Court has narrowly construed this prong of the test, requiring "unmistakable evidence of punitive intent" before an enactment may be invalidated on this basis. *Selective Service*, 468 U.S. at 855 n. 15, 104 S.Ct. at 3356 n. 15; *Flemming v. Nestor*, 363 U.S. 603, 619, 80 S.Ct. 1367, 1377, 4 L.Ed.2d 1435 (1960). In *Selective Service*, for example, the Court found no punitive intent despite "several isolated statements" by legislators "expressing understandable indignation over the decision of some nonregistrants to show their defiance of the law." 468 U.S. at 855 n. 15, 104 S.Ct. at 3356 n. 15. Here plaintiffs draw upon public opinion polls published early in 1984 showing voter approval of President Reagan's handling of the PATCO strike in support of their allegation that OPM's indefinite disbarment policy "worked a partisan political advantage for the President." Cmplt. ¶ 22. Of course, these polls cannot be evidence of punitive intent either on the part of President Reagan in issuing the directive or OPM in its initial implementation thereof because both events took place over two years prior to the release of the polling data. Plaintiffs ask this court to infer punitive intent from OPM's reinterpretation of the scope of the debarment policy—to include not only the FAA itself but also "closely related facilities"—"in the aftermath of the publication of said polls." We decline plaintiffs' invitation; the administrative record does not permit even a reasonable inference, let alone "unmistakable evidence," of punitive intent.[4] *See Nixon*, 433 U.S. at 484, 97 S.Ct. at 2810 (noting that an enactment may not be struck down "based upon infer-

---

4. Because we conclude that OPM's policy is not punishment under the Bill of Attainder Clause, we need not analyze whether the policy satisfies the third element of the test.

ences that we may be asked to draw from our personalized reading of the contemporary scene or recent history. In judging the constitutionality of the Act, we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or non existence of legitimate explanations for its apparent effect.").

### B.

■ Plaintiffs also submit that OPM's policy violates the *Ex Post Facto* Clause because it extended the debarment period from three years to an indefinite length after plaintiffs struck and were terminated for having done so. The *ex post facto* provision of the U.S. Constitution, Article I, § 9, clause 3, forbids Congress to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed." *Inglese v. United States Parole Com'n,* 768 F.2d 932, 934 (7th Cir.1985) (citing *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)). As noted above, *supra* at 1071, "regulations adopted by an agency pursuant to rule-making authority delegated to it by Congress can 'have the force and effect of law' in the context of the *ex post facto* prohibitions." *Inglese,* 768 F.2d at 935 (citing *Rodriguez,* 594 F.2d at 173). In the circumstances presented here, however, we need not decide whether OPM's policy is tantamount to the United States Parole Commission rule at issue in *Rodriguez* (or whether the definition of punishment under the *Ex Post Facto* Clause is distinct from that under the Bill of Attainder Clause) because the policy would not violate the ban on *ex post facto* laws even if it did impose a new or additional sanction on plaintiffs. The sanction levied here—ineligibility for certain federal jobs—is civil, not criminal, and from "earliest times," the Supreme Court has construed the *ex post facto* provision to apply only to criminal laws. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) (upholding the deportation of legally resident aliens because of their membership in the Communist Party, though that membership terminated before the enactment of a federal

statute making such an affiliation a basis for deportation). As Justice Jackson explained,

> It has always been considered that that which [the *Ex Post Facto* Clause] forbids is penal legislation which imposes or increases criminal punishment for conduct lawful prior to its enactment. Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure. Both of these doctrines as original proposals might be debatable, but both have been considered closed for many years and a body of statute and decisional law has been built upon them.

*Id.* Plaintiffs reliance on *Rodriguez* is inapposite because that case clearly imposed a criminal sanction—the retroactive application of a Parole Commission rule setting parole hearings every eighteen months—on a prisoner serving only a two-year term, thereby depriving him of any meaningful opportunity for parole. *See* 594 F.2d at 173–75.

### C.

■ Plaintiffs next claim that OPM's refusal to determine their suitability for reemployment with the FAA after the three-year maximum period of debarment violates their due process right to "pursue their professions." Cmplt. ¶ 32. They point to 5 C.F.R. § 731.303 as the source of the three-year limitation and allege that the presidential directive "did not suggest or direct that the debarment be extended beyond the maximum period set by regulation." Cmplt. ¶ 17. We disagree with both their characterization of the presidential directive and their conclusion that OPM failed to provide them with all the process that was due.

■ The Director of OPM has broad discretion in interpreting a presidential directive relating to federal personnel matters. *Wagner v. Office of Personnel Management,* 783 F.2d 1042, 1045 (Fed.Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 298 (1982). To be sustained, the agency's interpretation must be "reasonable," meaning that it cannot be plainly erroneous or inconsistent with the

President's order. *See Kester,* 652 F.2d at 15–16. In addition, "[a]n agency changing its course must apply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

As we observed above, *supra* at 2, 5 U.S.C. § 7311 expressly bars from federal employment any person who strikes against the United States government. In our view, this statute, written without condition or limitation, contemplates an indefinite ban. Even if an existing regulation, such as 5 C.F.R. § 731.303, applies a more lenient policy than that allowed by statute, the President, acting under his statutory authority to regulate federal employment, *see e.g.,* 5 U.S.C. § 3301,[5] may issue a directive overriding that regulation. *See Korte v. Office of Personnel Management,* 797 F.2d 967, 970 (Fed.Cir.1986); *American Federation of Gov't Emp. v. Hoffman,* 543 F.2d 930, 938 (D.C.Cir.1976) ("Under 5 U.S.C. § 3301, Congress has delegated broad authority to the President to establish the qualifications and conditions of employment for civil servants within the executive branch."), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977). Here the President did just that, and OPM's subsequent role was limited to executing the President's instructions.

In our view, OPM reasonably interpreted the language of the presidential directive to impose an indefinite ban upon the employment of controllers removed for striking, not only from all FAA positions, but also from positions which interface with FAA. We note that our colleagues on the Federal Circuit have reached essentially the same conclusion on at least two occasions. *See Wagner,* 783 F.2d at 1044; *Meyer v. Office of Personnel Management,* 767 F.2d 868, 870 (Fed.Cir.1985). Moreover, the fact that OPM appears to have determined the length

of the ban (indefinite) prior to ruling on its breadth (the FAA *and all interfacing agencies* ) does not undermine the reasonableness of its conclusions; in our view, both decisions flow naturally from the language of the President's order. The only remaining question is whether plaintiffs received the benefits of all of the due process protections to which they were entitled.

■ The Supreme Court has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause." *Lyng v. Payne,* 476 U.S. 926, 942, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986). However, as this case presents somewhat of a hybrid situation in that plaintiffs once had the benefit (employment with the FAA) that they sought to regain, we find it at least arguable that plaintiffs have asserted a protected liberty or property interest. An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–657, 94 L.Ed. 865 (1950)). Assuming, again without deciding, that OPM's refusal to determine plaintiffs' suitability for employment with the FAA implicates a constitutionally protected interest, we find that a judicial determination of whether each plaintiff actually participated in the PATCO strike provided all the process that was due in this instance. The district court found that "[p]laintiffs, like Korte, were found to be strike participants through an adjudicative proceeding where they were afforded 'safeguards of a judicial trial.' " 1993 WL 390234 at *4, (citing *Korte,* 797 F.2d at 971). Plaintiffs do not argue otherwise. Once that determination was made, there was no need for

---

**5.** Pursuant to 5 U.S.C. § 3301, the President may:

    (1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;

    (2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and

    (3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.

further judicial or quasi-judicial proceedings because the presidential directive, as rationally interpreted by OPM, clearly, explicitly, and without exception imposed an indefinite ban on employment with the FAA and related agencies.

### D.

■ Plaintiffs final contention is that they have been denied equal protection under OPM's indefinite debarment policy. In cases where a classification burdens neither a suspect group nor a fundamental interest, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Gregory v. Ashcroft*, 501 U.S. 452, 471, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991) (citations omitted). Here, because the right to government employment is not fundamental, *see Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313–14, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976), and plaintiffs' status as discharged air traffic controllers does not place them in a suspect class, plaintiffs concede, as they must, that OPM's policy need only withstand rational basis review. Under this standard, a provision will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legislative purposes that we can only conclude that the [people's] actions were irrational." *Gregory*, 501 U.S. at 471, 111 S.Ct. at 2406 (citations omitted).

The gravamen of plaintiffs' equal protection claim is that the policy is not rational because it denies to them the opportunity to undergo a suitability determination that was available to the thirty-eight previous classes of striking federal employees and would be available to convicted drug felons seeking federal employment. While plaintiffs description of the consequences of OPM's policy may be factually correct, such a state of affairs does not necessarily make an enactment infirm under the Equal Protection Clause. As the relevant Supreme Court precedents make clear, the government need not "deal alike with all … classes, or to strike at all evils at the same time and in the same way;" *Semler v. Dental Examiners*, 294 U.S.

608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935), "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). In our view, the explanations offered in the presidential directive advanced the legitimate governmental objectives of safety and efficiency in the administration of our nation's air traffic and suffice to rebut the claim that the policies enacted in furtherance of the directive are irrational.

### III.

By imposing an indefinite period of debarment from employment with the FAA and related agencies, the Office of Personnel Management reasonably interpreted President Reagan's order regarding air traffic controllers who violated federal law by striking against the United States. OPM's policies implementing the presidential directive did not violate either the Bill of Attainder Clause or the *Ex Post Facto* Clause and also did not deny plaintiffs due process or equal protection of the law. Accordingly, the district court's dismissal of plaintiffs' complaint in its entirety is

Affirmed.