In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1597 and 99-1628

Club Misty, Inc., doing business as
Tequila Roadhouse, et al.,

Plaintiffs-Appellants,

v.

James Laski, Clerk of the City of Chicago, et al.,

Defendants-Appellees.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 98 C 7831 & 98 C 8054--Charles R. Norgle, Sr., Judge.

Argued February 18, 2000--Decided April 3, 2000

 Before Posner, Chief Judge, and Bauer and Manion,
Circuit Judges.

 Posner, Chief Judge. Two licensed taverns in
Chicago appeal from the district court's
dismissal of their suit to enjoin an Illinois
state statute pursuant to which the plaintiffs
would have lost their licenses had they not been
granted preliminary relief that continues on
appeal. The statute, 235 ILCS 5/9-1 et seq., is
challenged both as depriving the plaintiffs of
their property without due process of law and as
a bill of attainder.

 Illinois liquor licenses are revocable only for
good cause during the one-year term of the
license and renewable as a matter of right when
the term expires unless the licensee is
unqualified or his premises unsuitable. 235 ILCS
5/3-14, 5/5-2, 5/6-1, 5/7-5. (A tavern must have
a local license as well, see 235 ILCS 5/3-14,
5/7-6; Chi. Munic. Code sec.sec. 4-60-20(a),
60(a), but the parties make nothing of this, so
we won't either.) There is no suggestion that
either plaintiff gave cause to have its license
revoked or not renewed. Each simply lost a vote
by the residents of the precinct in which its
tavern is located. The vote was authorized by 235
ILCS 5/9-2, which provides that if 40 percent of
the registered voters in a precinct petition the

board of elections for a vote on whether to prohibit the sale of liquor at a particular street address, the question shall be put to the precinct electorate at the next election and if a majority votes in favor of the prohibition the license of the establishment located at that address shall become void thirty days after the election. 235 ILCS 5/9-3. The record is silent on why these particular taverns incurred the voters' wrath; neither the petitioners nor the voters are required to give reasons. All we know, besides that the plaintiffs' taverns were duly licensed, is that in each precinct there are other liquor licensees who have not been voted out.

On the view we take of the case, we shall not have to decide whether the statute is a bill of attainder, U.S. Const., art. I, sec. 10, cl. 1; but we shall not conceal our skepticism that it is. A bill of attainder is a legislative punishment, and we may assume without having to decide both that a legislative delegation to the electorate of a standardless authority to punish would fall afoul of the prohibition of bills of attainder by constituting the electorate a surrogate legislature engaged in administering punishment, see Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 144 (1951) (concurring opinion); Dehainaut v. Pena, 32 F.3d 1066, 1070-71 (7th Cir. 1994); Laurence H. Tribe, American Constitutional Law sec. 10-6, pp. 660-61 (2d ed. 1988); cf. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 295 (1981), and that corporations as well as individuals are protected by the constitutional prohibition. See Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n. 9 (1995); BellSouth Corporation v. FCC, 144 F.3d 58, 63 (D.C. Cir. 1998); BellSouth Corporation v. FCC, 162 F.3d 678, 684 (D.C. Cir. 1998); SBC Communications, Inc. v. FCC, 154 F.3d 226, 234 and n. 11 (5th Cir. 1998). Even so, it is doubtful that what the voters have voted to do to the plaintiffs can be regarded as punishment.

The requirement of punishment is most clearly satisfied when a punitive purpose is conjoined with a characteristically punitive sanction, such as a fine. See generally Nixon v. Administrator of General Services, 433 U.S. 425 (1977). (During the impeachment of President Clinton, there was much discussion of whether a congressional resolution censuring him would have been a bill of attainder.) We may assume, again without having to decide still another unsettled issue, that either a punitive purpose or a characteristically punitive sanction would suffice to make legislation directed against a particular individual or firm (of which a given street address is a transparent proxy) a bill of

attainer. Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 852-54 (1984); Nixon v. Administrator of General Services, supra, 433 U.S. at 473-84; De Veau v. Braisted, 363 U.S. 144, 160 (1960); Dehainaut v. Pena, supra, 32 F.3d at 1071-73; Planned Parenthood of Mid-Missouri and Eastern Kansas, Inc. v. Dempsey, 167 F.3d 458, 465 (8th Cir. 1999); SBC Communications, Inc. v. FCC, supra, 154 F.3d at 241; Tribe, supra, sec. 10-5, p. 655. The problem here is that we have no information about the purpose that actuated the petitions and the votes against these licensees; nor is the revocation of a license a characteristically punitive sanction, Brookpark Entertainment, Inc. v. Taft, 951 F.2d 710, 717 (6th Cir. 1991); cf. Rivera v. Pugh, 194 F.3d 1064, 1068 (9th Cir. 1999); United States v. Emerson, 107 F.3d 77, 81-83 (1st Cir. 1997), though it can inflict great hardship.

 We need not pursue the issue further, as we think the statute is unconstitutional as a denial of due process of law even if it is not a bill of attainer. We reach this conclusion on the basis of two previous decisions of this court, Reed v. Village of Shorewood, 704 F.2d 943 (7th Cir. 1983), and Philly's v. Byrne, 732 F.2d 87 (7th Cir. 1984). Neither side in the present litigation challenges the soundness of either decision. They differ as to the decisions' correct interpretation but they do not ask us to overrule either one in whole or in part. And so those decisions provide the framework for our analysis.

 Reed holds that an Illinois liquor license is a property right within the meaning of the due process clause of the Fourteenth Amendment. 704 F.2d at 948-49. The license is revocable during its term only for cause, just like a public school teacher's tenure contract--a familiar example of "property" as the Supreme Court has defined the term in the due process clauses of the Fifth and Fourteenth Amendments. E.g., Perry v. Sindermann, 408 U.S. 593, 601 (1972). Were renewal a matter of administrative grace, the challenged statute would be vulnerable only in cases in which the license was voided before the expiration of its current term. E.g., Movers Warehouse, Inc. v. City of Little Canada, 71 F.3d 716, 718-19 (8th Cir. 1995); Kraft v. Jacka, 872 F.2d 862, 866-68 (9th Cir. 1989), overruled on other grounds by Dennis v. Higgins, 498 U.S. 439 (1991). But we held in Reed, relying on the Illinois Appellate Court's decision in City of Wyoming v. Liquor Control Comm'n, 362 N.E.2d 1080, 1084 (Ill. App. 1977), that Illinois law treats a refusal to renew a liquor license as equivalent to revocation, entitling the licensee

"to all the protections, procedural and substantive, of the revocation process, [and] thus making [the licensee's] interest in renewal a property right for purposes of the Fourteenth Amendment." 704 F.2d at 949. We followed Reed in Kelly v. City of Chicago, 4 F.3d 509, 511 (7th Cir. 1993), as well as in Philly's v. Byrne, supra, 732 F.2d at 90, as did the Sixth Circuit in Brookpark Entertainment, Inc. v. Taft, supra, 951 F.2d at 714-15; see also Easter House v. Felder, 910 F.2d 1387, 1395 (7th Cir. 1990) (en banc); compare Herz v. Degnan, 648 F.2d 201, 208 (3d Cir. 1981).

 The City of Chicago (the principal defendant) does not challenge any of these cases though it tweaks us a bit by remarking in a footnote that our holding that a liquor license is property has been rejected by the Illinois Appellate Court in decisions rendered after Reed. See Blue Cat Lounge, Inc. v. License Appeal Comm'n, 667 N.E.2d 554, 557 (Ill. App. 1996); Ole, Ole, Inc. v. Kozubowski, 543 N.E.2d 178, 181-82 (Ill. App. 1989); Ross v. Kozubowski, 538 N.E.2d 623, 626 (Ill. App. 1989); Black Knight Restaurant, Inc. v. City of Oak Forest, 513 N.E.2d 109, 111 (Ill. App. 1987). These cases rely on a provision of the Illinois Liquor Control Act which states that a liquor license is not property, 235 ILCS 5/6-1, and on "the wooden distinction between 'rights' and 'privileges'" that the Supreme Court has "fully and finally rejected." Board of Regents v. Roth, 408 U.S. 564, 571 (1972). As we explained in Reed, such a declaration and such a distinction cannot conclude the constitutional issue of whether the license is property, and indeed has very little relevance to it. Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9 (1978); Brookpark Entertainment, Inc. v. Taft, supra, 951 F.2d at 714; Sea Girt Restaurant & Tavern Owners Ass'n, Inc. v. Borough of Sea Girt, 625 F. Supp. 1482, 1486-88 (D. N.J.), aff'd without opinion, 802 F.2d 448 (3d Cir. 1986). Think back to the classic case of constitutional property--a teacher's tenure contract. Obviously such a contract would not be classified as "property" or a "property right" under state law, a classification that would weirdly imply that a teacher could sue his employer for trespass if he were fired in breach of the contract. For most purposes, perhaps for all but one purpose, an Illinois liquor license is not property; but insofar as it is revocable (or nonrenewable) only for cause, it is property for purposes of determining whether the state can deprive the licensee of it without according him due process of law. Baer v. City of Wauwatosa, 716 F.2d 1117, 1122 (7th Cir. 1983); see also Perry v. Sindermann, supra, 408 U.S. at 601.

The City denies that a liquor license is property for a reason unrelated to Reed--that the challenged statute so eviscerates the rights of liquor licensees as to destroy their status as owners of constitutional property. We left this issue open in Philly's. 732 F.2d at 90-91. That case arose under the provision, codified in the same section of the Illinois Liquor Control Act as the provision challenged in this case, that allows the voters in a precinct to vote the entire precinct dry, as distinct from prohibiting the sale of liquor at a particular address. We held that there was no denial of due process (see also Sam & Ali, Inc. v. Ohio Dept. of Liquor Control, 158 F.3d 397, 398-99 (6th Cir. 1998); 37712, Inc. v. Ohio Dept. of Liquor Control, 113 F.3d 614, 619 (6th Cir. 1997)) and so we didn't have to decide whether there was a deprivation of property. We did a little dance around the issue. On the one hand we pointed out that the power to vote a precinct dry could conceivably be thought an implicit term of every liquor license, in which event such a license could no longer be thought revocable or nonrenewable for cause and so it would lose the defining characteristic of constitutional property. On the other hand we pointed out that such an analysis, implying as it does that by repealing procedural protections a state could demote property to nonproperty, would leave very little standing of the constitutional protection of property, since the essential protection is precisely the guarantee of the procedural safeguards (basically notice and an opportunity to be heard) that constitute the core of the concept of due process of law as it is understood in the modern decisions.

Today we have to bite the bullet. In conformity with the case law that has accreted since Philly's was decided, see Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541 (1985); Youakim v. McDonald, 71 F.3d 1274, 1289 (7th Cir. 1995); Listenbee v. City of Milwaukee, 976 F.2d 348, 352 (7th Cir. 1992); Campbell v. Miller, 787 F.2d 217, 223 (7th Cir. 1986); Furlong v. Shalala, 156 F.3d 384, 395 (2d Cir. 1998); Frazier v. Garrison I.S.D., 980 F.2d 1514, 1528-29 (5th Cir. 1993); Brookpark Entertainment, Inc. v. Taft, supra, 951 F.2d at 716-17, we hold that the two-step process for eliminating due process rights that we have just described, of which the first is to authorize a procedure for extinguishing property rights that does not conform to the requirements of due process and the second is to invoke that process to extinguish a particular person's property right, is ineffectual to destroy constitutional property.

We are mindful that the Twenty-First Amendment

to the Constitution gives the states very broad power over the sale of alcoholic beverages. Illinois could if it wanted forbid such sale altogether; it certainly is not required to give liquor licensees the attributes of constitutional property. But it has given them those attributes, as we have seen, and the challenged statute does not purport to remove them. It creates no new substantive criteria for the grant or withdrawal of Illinois liquor licenses. Nothing in it purports to alter the "for cause" condition that makes those licenses property within the meaning of the due process clause. It does not refer to the provisions of Illinois law that we have held make liquor licenses "property" for purposes of the clause, or to the Twenty-First Amendment. All the referendum statute does is provide an alternative procedure for revocation of liquor licenses. This is apparent from the legislative history, as we are about to see. The supporters of the statute believed that it would provide a swifter alternative to administrative procedures for revoking the licenses of "bad apples," which is to say licensees who had given cause for revocation.

The plaintiffs thus have a property right of which the voters in their precincts deprived them, and the remaining question is whether the deprivation was brought about by a method that denied the plaintiffs due process of law. The City argues "no," relying on Philly's, where we held that while an election is not an adjudicative procedure that comports with due process, the fact that the voters of a precinct could get rid of a liquor licensee whom they didn't like (for whatever reason) only by voting the entire precinct dry provided the disfavored licensee with protection and marked the vote as a legislative rather than an adjudicative act. It is the same kind of protection that is provided by the equal protection clause, see Railway Express Agency v. New York, 336 U.S. 106, 112-13 (1949) (Jackson, J., concurring), and by the principle, which is the very foundation of the concept of the rule of law (as well as of the prohibition of bills of attainder), that a legislature can prohibit private conduct only through general rules. Chicago precincts are small (each is supposed to have 400 registered voters, 10 ILCS 5/11-3, 11-5), which reduces the protection conferred by requiring the precinct to vote itself dry rather than picking on a particular licensee--many precincts have only one liquor licensee. But we emphasized that "the Illinois act does not permit the precinct's voters to single out a particular liquor seller to shut down. . . . This means not only that the licensee who is disliked is protected to some extent by the licensee who is liked [if there is

one] but also that the voters cannot impose costs on liquor sellers without imposing costs on themselves--the costs of not being able to buy liquor in the precinct." 732 F.2d at 92.

 Philly's was decided in 1984. Five years later the Illinois legislature added to the Liquor Control Act the provision challenged in this case. Why? The only reason that is suggested in the legislative history, and anyway the only reason that is remotely plausible, is that the legislature wanted the residents of a precinct to be able to get rid of a particular licensee of whom they disapproved. See, e.g., Statement of Rep. McGann, in Transcript of General Assembly, June 27, 1989, at 138-39 ("But say you have one [tavern] that is causing real problems, causing problems for the neighbors around them and so forth that they cannot affectively [sic] by the law presently of the police administration deal with these situations and the community neighbors are having problems. This will not penalize the good licensees in these areas, but will only target that bad operator"). The reason for targeting a particular licensee could be a good one, as this quotation from the legislative history suggests--that the licensee was selling liquor to minors, or serving drunks, or attracting a rowdy lot from other neighborhoods, or disturbing the neighbors with loud music. Any of these could be a solid ground for revocation; and although if there is such a ground the authorities presumably will revoke the license-- eventually--the procedures for revocation that comport with due process often take a long time to complete. Their length is a practical reason for wanting to have a substitute mode of revocation that is not encumbered by procedural safeguards. See Statement of Sen. Marovitz, in Transcript of General Assembly, July 1, 1989, at 3 ("you may have a particular bar, a particular tavern that's causing a tremendous problem. I have a lot of them in my district, where you have drug dealers, where you have prostitution, where you have knifings and shootings. We have tried and tried and tried before the Liquor Commission of the City of Chicago to close those taverns. We've been turned away every time"). But the guarantee of due process would mean little if it could be dispensed with upon a showing, which could be made in every case, that a remedy that provides no procedural safeguards at all will be faster and cheaper than one that provides some. The costs of procedural safeguards are only half the formula that the Supreme Court set forth in Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976), for determining the minimum requirements of due process. The other half is the benefits in preventing error. The challenged statute contains no safeguards against error.

A vote by neighbors to decide whether a particular person or firm is a bad apple exemplifies "popular justice," the mode by which an Athenian jury, without deliberation, without instruction or control by professional judges, without possibility of correction on appeal, and without the assistance of lawyers, condemned Socrates. The revocation of the liquor license of the Tequila Roadhouse is not to be compared with the death sentence imposed on Socrates. Yet Socrates received more due process than the Tequila Roadhouse, since he had an opportunity to argue his innocence to the jury and the jury convicted him of a crime, albeit a vague one (corrupting the morals of the young men of Athens by questioning pious certitudes). There is no standard to guide voters in deciding whether to void a liquor license. We need not attribute frivolous motives to them. Yet just as we do not trust jurors to deliberate without instructions, so we should be concerned that an electoral free-for-all might result in serious errors that a due process hearing would avert. The voters might be stirred to action by an influential resident of the precinct who was angry about being refused service because he was inebriated. They might be outraged because one of the taverns in the precinct had topless waitresses--or refused to have them. They might be victims of a campaign of disinformation by a competing tavern--a possibility that concerned Representative Matijevich, who in Transcript of General Assembly, June 27, 1989, at 137-38, observed: "let's say that in a precinct there are two establishments, only two establishments. And one establishment may have some political pull. . . . [Y]ou may have that establishment lobbying in an election to get the other competition out of business for no other reason than he likes to get all the business for himself"). They might be induced to vote against a tavern by a precinct captain who was on the outs with the tavern's owner. The possibilities are myriad and some of them are unsavory, and against them the procedure established by the challenged statute offers no protection at all.

This will not bother anyone who believes that the democratic process should be left completely unhindered by law. But that is not the theory of the Constitution. An individual's life, liberty, and property are not held or enjoyed at the sufferance of the electorate. When the Illinois legislature stepped from allowing a precinct's voters to vote the precinct dry to allowing the voters to expel a particular disfavored licensee, it crossed the line that protects property holders from being deprived of their property without due process of law. Although taverns are

not the most popular businesses in some quarters, no principle is suggested that would limit the power claimed by the City to the sale of alcoholic beverages. Its position casts a long shadow over all property rights. We pointed out earlier that the state has not attempted to exert its plenary powers under the Twenty-First Amendment to curtail the abuses to which the sale of alcoholic beverages may give rise.

Nothing that we have said is intended to suggest that referenda are unconstitutional. The Constitution does not forbid direct democracy. City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668 (1976), holds that voters can be empowered to act as legislators--but that is provided that the action they are empowered to take is legislative. City of Eastlake was a zoning case, and zoning is on the legislative side of the legislative/judicial divide. River Park, Inc. v. City of Highland Park, 23 F.3d 164, 166-67 (7th Cir. 1994); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461, 468-69 (7th Cir. 1988). This is not only because "the decision whether and what kind of land uses to permit does not have the form of a judicial decision. The potential criteria and considerations are too open-ended and ill-defined." Id. at 468. It is also because zoning, like ordinary legislation, operates prospectively. The lawful destruction of existing property is the domain of nuisance law, a branch of tort law that is applied by courts to specific offending properties. As Justice Holmes, writing for the Court in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226-27 (1908) (citations omitted), pointed out, "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. . . . Proceedings legislative in nature are not proceedings in a court, . . . , no matter what may be the general or dominant character of the body in which they may take place. That question depends not upon the character of the body, but upon the character of the proceedings." See also New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 370-71 (1989).

The statute that is challenged in this case does not authorize the voters to determine, in the manner of zoning, where liquor may be sold (a possible interpretation of Philly's); it authorizes them to evict a particular seller, as if they were the judges of a housing court or a

judge asked to abate a nuisance. Cf. Nasierowski Bros. Investment Co. v. City of Sterling Heights, 949 F.2d 890, 895-96 (6th Cir. 1991); Harris v. County of Riverside, 904 F.2d 497, 501-04 (9th Cir. 1990). The vote is limited to a specific street address currently occupied by a licensee, 235 ILCS 5/9-2; it does not prevent the sale of liquor next door. In the typical zoning case prospective uses of property are in issue, and decision making is likely to be based on general, legislative grounds. Voters are likely to consider whether they want a building "like that" in their neighborhood. The primary factor in a targeted liquor referendum is bound to be, in contrast, the past behavior of the tavern, for the voters have already decided to permit businesses "like that" in the neighborhood. (Remember that they could vote the precinct dry if they wanted.) Something has forced them to change their minds about this tavern, and the only plausible explanation is the tavern's behavior, but the evaluation of past behavior for conformity to norms of proper conduct is the domain of adjudication.

So the issue "is not too much delegation, but delegation to the wrong body: delegation of judicial decision-making, for example, to people who are not judges." United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Comm'n, 760 F.2d 155, 159 (7th Cir. 1985); see also City of Eastlake v. Forest City Enterprises, Inc., supra, 426 U.S. at 678; Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22 (1928); Eubank v. City of Richmond, 226 U.S. 137 (1912); Jones v. Bates, 127 F.3d 839, 858 n. 25 (9th Cir. 1997); General Elec. Co. v. New York State Dept. of Labor, 936 F.2d 1448, 1454-55 (2d Cir. 1991); Scott v. Greenville County, 716 F.2d 1409, 1420 n. 16 (4th Cir. 1983). That is what Illinois has done and what the due process clause prohibits.

Reversed.


BAUER, Circuit Judge, dissenting. In order to better understand the ramifications of the majority opinion, a bit of urban reality is, I believe, in order.

The residents of the City of Chicago, 2,700,000 or more, live in neighborhoods characterized by their homogeneity. The residents share, in general, the same socio-economic status, the homes are strikingly similar in configuration and costs, and the blue-collar/white-collar employment of the workers are usually the same. Racial and/or ethnic backgrounds tend to be similar. Although neighborhoods have no

recognized political existence, they are there, with or without political acknowledgment, and it is there that Chicagoans live, marry, raise families, socialize and die. Most of the residents lack real mobility of choice; affordable housing near or convenient to employment or transportation is what they must settle for. Stability of neighborhood and safety are their primary objectives. Many have no choice at all; public housing or subsidized housing dictates where they live.

What businesses are in or around these neighborhoods are there because the zoning laws and licensing regulations, planned on a city-wide basis, permit their existence. (Of course, the business investors look for areas of opportunity and that plays a major role in what businesses exist side by side with the residential buildings.)

Barber shops, grocery stores, convenience markets, drugstores, restaurants, tailor shops, all these exist in the neighborhoods and add to the livability of the area. One business, however, is acknowledged to have a greater impact on the tone of a neighborhood than any other--the liquor business.

For purposes of this case, we need not think in terms of liquor stores but only those licensed premises which purvey drinks by the glass. They include most fine restaurants, many family or ethnic restaurants, and neighborhood saloons; those places that Chicago historians called the working man's social clubs. It is here that the people meet, not just to drink, but to eat, to celebrate birthdays, anniversaries and other special occasions and to socialize with people of the neighborhood.

When Illinois exercised its right to control (or ban altogether) the sale of liquor, it opted to create a system of local-option rules. The decision as to whether to permit liquor sales, to define how many and where such emporiums could exist was left to cities and villages and even counties for the unincorporated areas. Moreover, the towns and villages, many with a smaller total population than a Chicago precinct, can determine the character of the liquor emporium. They can, for instance, regulate the type of entertainment a licensee can offer the public, the hours and days of purveying, or even restrict the sale of liquor to hotels or places that serve food. Because of its size, however, Chicago (technically, cities of a certain size that only Chicago meets) is treated differently. Recognizing that neighborhoods most closely resemble small towns, the legislature sought to

give some local control.

There is, however, as we have said, no political entity called a "neighborhood"; its closest parallel is the precinct. A "precinct" is not a definable graphic area; it is an entity that exists only to facilitate voting. It is created by the city in its establishment of places to vote; ideally, each precinct will contain 400 registered voters. When the number of registered voters goes much above or below that figure, the precinct boundaries must, by law, be redrawn. This to ensure a conveniently close place for voters to exercise their franchise and to reduce the possibility of long lines of voters waiting for a vacant polling booth.

Of course, in addition to the 400 registered voters, the precinct will contain many more people: those ineligible to vote because of their minority, non-citizens, those who have not established sufficient length of residency and (if voter registration proponents are to be believed) a large number of people, otherwise eligible, who have not bothered to register to vote. In short, a "precinct" is close to being a neighborhood or a small town and it has a political existence. And local option of sort is granted to these entities.

As I said, it is usually to the economic self-interest of a license holder to maintain cordial and friendly relations with the people of the area where his establishment is located; they are a source of business to him. There are some establishments that attract patrons from areas distant from the precinct, either because of a particular form of entertainment, glowing restaurant reviews, proximity to sports arenas, etc. (The people living near sports arenas show an extraordinary patience with absurd activities of the fans, but it is also true that the sports bars make extraordinary efforts to keep the locals happy. Properly speaking, the two groups establish a mutually advantageous economic truce. The saloons and restaurants are sources of employment--as in the area itself--and the locals provide some patronage during off-season months).

As to the premises that cater to different clientele, striptease fans, loud music fans, youth groups, bikers--not to mention premises that cater to the drug culture or other illegal activities--these groups try to keep the irritation level of the activity to a minimum because they know about the local-option laws. And if enough of their neighbors get pushed hard enough, they can respond by eliminating the problem through the ballot box.

To suggest, as the majority opinion does, that a voter who is disgruntled by the refusal of a bartender to serve him while inebriated can eliminate a license, is to ridicule the intelligence of the voters. To imagine that such a malcontent could convince a majority of the voters in a precinct (or even the smaller number called for to place the issue on the ballot) to take up the cudgel of the ballot on such a silly crusade is, itself, ridiculous.

The fact is the motivation behind such a difficult task as securing signatures on a petition and votes in the ballot box is one the majority should well understand: cost-benefit. The term may not be used but, as we know, it is the real motivation behind most human activity. I should think that this constitutionally permitted reason should be both understood and applauded.

As we have seen, most liquor license holders are benign influences in the areas around them, even serving to enhance the livability and property values of the neighborhood. Nevertheless, under the original rule of local option, the precinct had only one choice: vote entirely dry or put up with the one or more festering sores.

The right of the precincts to vote entirely dry was endorsed by this court (indeed, by the author of the majority opinion in the instant case). And if there is only one such establishment in the precinct and only one possible target of the vote-to-go-dry, it still passes constitutional muster. Apparently, the constitutional rights of an individual liquor license holder increase with the number of licenses in a precinct; they can take shelter in the acceptance of their good brothers-in-business and thumb their noses at the legitimate wishes of the residents of the neighborhood.

The legislature recognized the unfairness of this all-or-nothing approach to the wet/dry dilemma when they amended the local-option law to permit a referendum on the issue of whether a single (or, I assume, more than one) liquor establishment shall continue to be licensed in the precinct. This is so that the businesses which have decent regard for the preservation of the community standards can remain and their property rights not scuttled by a bad apple in the liquor dispensing barrel.

The majority opinion agrees with the Supreme Court that the Constitution does not forbid direct democracy. What seems to be the theme of the opinion is that, under the local-option rule, voters can exercise their franchise without "standards to guide the voters in deciding

whether to void a liquor license." One assumes by this, "judicial guides". And, of course, such is the price of democracy; the voters may make a choice that their betters may not approve.

The majority opinion points to the use of judicial instructions in jury trials and describes the referendum (or election) process as an "electoral free-for-all" that might result "in serious error". Just so. The process of democratic government does not rely on stern lectures from the highly educated. The least of us has the right to express himself or herself in the ballot box without deference to the ruling classes. It is also of interest to note that a precinct, if so inclined, can, as this court (and the author of the instant majority opinion) has ruled, snuff out the license rights of one, or any number of, licensees in the precinct without the splendid guidance of court or city fathers, providing that all the licensees in the precinct are eliminated. Why is the same use of the ballot box constitutionally infirm if the licensees affected are fewer than all of those in the precinct? If "guidance" is required to make the decision of the voters constitutionally kosher, why not require that such guidance (whatever that might be!) be required for all referenda that affect a property right (bond issues, annexation, establishment of school districts and mosquito abatement districts, etc.)?

It is not accurate to say, as the majority opinion does, that, before a referendum is undertaken "the voters have already decided to permit businesses" like that "in the neighborhood" because they could vote the precinct dry if they wanted to. What is more accurate is that they made no decision at all; the city makes it for them. It is probably also safe to say that not one voter in fifty even knows about the local-option rule and only a crisis in the neighborhood eventually may serve to enlighten them--and then after every other avenue to correct a problem involving a liquor licensee (petitioning the city liquor commission, calling the police, calling the alderman, etc.) has failed.

The deprivation of property, discussed by the majority, occurs in exactly the same way whether the voters wipe out all of the liquor vendors in a precinct or a single vendor. I fail to see how a total deprivation of "property rights" that affects two or more owners is more constitutional than the same action which affects only one liquor emporium.

It is worthwhile considering how much trouble such a referendum is to the people of the precinct. First, to focus the residents on the way to solve the problem (I'm willing to assume

the existence of the problem and knowledge of its existence among the neighbors), then to secure sufficient signatures to get the matter placed on the ballot, and then to campaign successfully enough to get a majority of the voters to vote against an existing business. The effort involved and the work entailed should at least indicate to us the incredible problem the licensee must be causing. And it is a fact that, like Socrates, the liquor dispenser has an opportunity to present his defense to the jury (i.e., the voters); he can campaign as hard against the referendum as his opponents argue for it; it might even convince him to reform before the vote and become a good neighbor.

I believe that the legislature of Illinois and its court system can protect the rights of its citizens in the field of liquor control and neighborhood safety. If it is constitutionally proper for the voters of a precinct to ban the only bar in the area, or all the bars in the neighborhood, I cannot believe that it is constitutionally improper for the legislature to authorize, and the voters to exercise, a right to prohibit the operation of a particular liquor license. There is no constitutional right to be in the liquor business and I cannot believe that the authorization of a referendum as to whether a particular saloon shall be permitted in a neighborhood is an invasion of a constitutional right. I suspect it depends on whose constitutional property rights should concern us. I think the rights of the people who live in the area should have our deepest concern.

I would affirm the dismissal of the case.