Joyce CAMPANA, Plaintiff,

v.

**CITY OF GREENFIELD, et al., Defendants.**

No. 00–C–0282.

United States District Court, E.D. Wisconsin.

Sept. 28, 2001.

---

Robert E. Sutton, Robert E. Sutton Law Office, Milwaukee, WI, for plaintiff.

William W Ehrke, Crivello Carlson Mentkowski & Steeves, Milwaukee, WI, for defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Joyce Campana brings this action against her former employer, the City of Greenfield, her former supervisor, Tim Seider and two former co-workers, Milton Vandermeuse and Edward Neudauer ("defendants") alleging violations of Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000(e), et. seq., the Equal Pay Act, 29 U.S.C. § 206(d), et. seq., and her Fourteenth Amendment right to due process actionable under 42 U.S.C. § 1983. Initially, plaintiff also brought a number of state law claims, but has since withdrawn them. Defendants now move for summary judgment on all claims.

## I. STANDARD OF REVIEW

Rule 56(c) requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; the dispute must be material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party opposing summary judgment "may not rest upon mere allegations or denials" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Supporting and opposing affidavits shall be made on personal knowledge, ... [not] conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "However, [I am] not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). Moreover, neither the "mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, nor the demonstration of "some metaphysical doubt as to the material facts," *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348, will sufficiently demonstrate a genuine issue of material fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## II. FACTS

On March 5, 1991, Joyce Campana began working for the City of Greenfield ("City") as its treasurer. As treasurer, she oversaw the City's cash management and investments, and "prepared tax bills, sewer bills, the tax roll ... [and] collect[ed] all city receipts." (Campana 4/30/01 Aff. ¶6.) Qualifications for the position included a Bachelor's degree and four years related experience in "finance, cash management, budgeting and general accounting work," with experience in "municipal finance [and] accounting ... preferred." (Campana 4/30/01 Aff. Ex. 6.) Campana herself held a Bachelor's degree in Political Science and a Masters in Public Administration with a specialization in public finance.

In 1992, the City created the position of comptroller to oversee the accounting department. The comptroller was to "direct[ ] the financial activities" of the City by overseeing the accounting system, compiling financial reports for the state, performing internal audits, guiding the work of outside auditors, coordinating the development and implementation of the City budget, and overseeing the City's computerized information system. (Reply to Pl.'s Resp. to Defs.' Proposed Findings of Fact ¶¶ 10–17.) Qualifications for the position included a Bachelor's degree in Accounting and between four and ten years related experience, with a Public Accountant Certification desired. In early 1994, the person who had held that position since its creation notified the City that he intended to resign.

With the impending resignation, Campana sent a memorandum to the City personnel director, Edward Neudauer ("Neudauer") and to the City finance

committee recommending that the City combine the treasurer's and the accounting departments. She stated that this consolidation would "achieve more efficient operations and better customer service." (Blumenfeld Aff. Ex. G.) Campana's proposed structure did away with the comptroller's position, replacing it with an "accounting assistant" who would work under the treasurer, the head of the combined departments. (Id.) The City took no action on Campana's proposal, and in September hired Milton Vandermeuse ("Vandermeuse") to serve as comptroller. Vandermeuse held a Bachelor's degree in Accounting and was a Certified Public Accountant. Campana had also applied for the position.

On October 18, 1994, Campana sent a memorandum to the City aldermen stating that the City was violating the Equal Pay Act by setting her annual salary at $228 below that of the comptroller, then Vandermeuse. (Campana 4/30/01 Aff. Ex. 9.) In 1991 and 1992, the treasurer's salary had been slightly higher than the comptroller's, but in 1993 and 1994 it had been lower.[1] (Campana 4/30/01 Aff. Ex. 28.) In a memorandum to the mayor following Campana's complaint, Neudauer stated that a $228 increase in Campana's salary might be appropriate, given that the comptroller and treasurer had "nearly equal duties." (Campana 4/30/01 Aff. Ex. 9.)

In 1995, the Council passed an ordinance giving it sole authority over decisions regarding salary rates and pay increases. Campana offers evidence that Vandermeuse's annual salary was $929 higher than hers in 1995, $3,700 higher in 1996, and $4,803 higher in 1997. (Campana 4/30/01 Aff. ¶ 9.) The parties have not offered evidence of their salary differential in 1998.[2]

In 1995, Greenfield elected a new mayor, Tim Seider ("Seider"), who took office in 1996. The record indicates that the new administration began to examine more intensively the idea of consolidating City departments. At least three different organizational structures were discussed. First an outside firm hired by the City recommended that the City combine the offices of clerk and treasurer because the treasurer's office workload was "seasonal/cyclical." Second, Neudauer acting under Seider's authorization, surveyed other cities and found that many combined either the offices of clerk and treasurer or the offices of comptroller and treasurer.[3] Neudauer believed that under the current structure, the treasurer's office was overstaffed, while the comptrol-

---

**1.** The salaries differed in 1991, 1992 and 1993 by the following amounts: In 1991, the treasurer's annual salary was $342.85 higher than the comptroller's. In 1992 the treasurer's annual salary was $1,218 higher than the comptroller's. In 1993, the treasurer's salary was $227 lower. These comparisons are based on the full salaries for the positions, not the entry level salaries.

**2.** Defendants dispute the differences in pay. They assert that the salaries differed at most by several hundred dollars and sometimes were equal. In addition, Campana asserts in her complaint that the City denied her merit pay while granting merit pay to Vandermeuse. The parties have not submitted evidence indicating how much of the difference is attributable to merit pay. As the case is before me on a motion for summary judgment, I will assume Campana's statement of their salaries is true and I will disregard her allegation regarding denial of merit pay.

Campana also indicates that Vandermeuse's salary for 1998 was $39,165 higher than hers. (Campana 4/30/01 Aff. ¶ 28.) This number is misleading because Campana only worked for the City for four months in 1998. The relevant salary is that set by the Council, not what Campana took home.

**3.** Campana disputes this evidence on the ground that the scope of Neudauer's study is unknown; however, it remains undisputed that he performed some survey of how other cities structure these positions.

ler's office was understaffed. Third, the City personnel committee recommended combing the assessor's office, treasurer's office, comptroller's office, clerk's office and the information systems administration into the "department of finance and administration" under a single director. The City Common Council ("Council") approved this last proposal. Pointing to his accounting background and certification, the Council chose Vandermeuse as director of the combined departments. For reasons the record does not make clear, only the accounting department and the assessor's office were actually consolidated at that time.

During the next two years, Campana's relationships with Seider, Neudauer and Vandermeuse declined. On April 3, 1996, Seider came to Campana's office to discuss statements she had made at two finance committee meetings about matters that Seider believed should have been handled internally and to discuss comments she had written on her time sheet "relating to personnel within another department." (Campana Dep. at 68–69; Campana 4/30/01 Aff. Ex. 35.) Seider's memorandum to Campana memorializing the incident states that Campana responded by saying that she could "write whatever [she] want[ed]." (Campana 4/30/01 Aff. Ex. 35.) During the course of the conversation, Seider raised his voice, pointed his finger at her and gave her a "verbal warning" for her statements at the meetings and on the time sheets. (Id.)

Campana also had difficulty obtaining Seider's approval for travel. She requested approval to attend three different conferences in 1997. The record does not indicate whether he eventually approved the requests, but does indicate that he did not respond for as many as four weeks. Campana has supplied the court with a copy of a travel request from a male City employee approved by Seider the day after it was submitted. In April 1997, Campana also requested approval to attend the State Treasurer's Advisory Council, on which the State Treasurer had asked her to serve. Seider denied her request stating that her presence on the state council would indicate that he "endorsed [her] performance as treasurer." (Campana 4/30/01 Aff. Ex. 30.) Because of their "tremendous communication problem" and because of her "vision and inability to comprehend fundamentals of goal setting and service to the City," he could not make such an endorsement. (Id.)

On June 12, 1997 in her office in front of other City employees, Campana made a sarcastic comment to Vandermeuse about "distribution of credit." Vandermeuse responded by saying that he was "tired of her shit." (Campana 4/30/01 Aff. ¶ 17; Defs.' Proposed Findings of Fact ¶¶ 44–47.) He then left the office, but returned and apologized. Campana filed a written complaint with Seider about Vandermeuse's conduct. Neudauer investigated the incident and interviewed those present, except for Campana. In his report to the mayor, Neudauer recommended that no disciplinary action be taken and stated that those interviewed expressed "annoyance" with Campana's "loud behavior" and her "general hostile attitude." (Blumenfeld Aff. Ex. J.)

Campana also states that Vandermeuse "star[ed] or gawk[ed]" at her several times a week and on several occasions, stared at her while she was in the hall talking to others by the water fountain. (Campana Dep. at 71–75.) In addition, she states that Vandermeuse would walk behind the cash registers at City Hall, which would result in Vandermeuse and Campana physically bumping into each other. (Id. at 75–76.) Campana asked him to use another route, but Vandermeuse did not comply. (Id.)

Meanwhile, City administrators continued to discuss further consolidation of departments. In August 1997, the personnel committee recommended to the Council that the City combine the accounting department, then headed by Vandermeuse, with the treasurer's office. The new combined department, the "finance department," would be headed by a finance director. The Council approved this new structure in a charter ordinance passed on August 19 and named Vandermeuse finance director. The Council and the personnel committee expressed concern that no one lose his or her job as a result of the reorganization; therefore, Campana would hold a new position entitled "analyst/special projects," working under Vandermeuse. Although Campana would receive no reduction in pay or benefits, she would no longer head her own department and would have to report to Vandermeuse. Seider requested that the Council complete the job descriptions at a later date to allow the staff some flexibility in forming the new combined department and allocating duties.

This new structure sparked some controversy and on October 21, Greenfield residents submitted a petition for referendum, scheduled for April 7, 1998. In the interim, Campana remained treasurer and Vandermeuse remained director of the combined assessor and accounting departments. Campana asserts that during these months, Vandermeuse acted as if he were her supervisor and attempted to run her department.

In November the Council voted on the 1998 budget. The budget largely reflected the organizational structure approved in August, the subject of the upcoming referendum, but provided no funding for two positions the analyst/special projects and the assistant assessor. The budget funded the treasurer position only through April 30, 1998. No one presently held the assis-

tant assessor position and the position had not been earmarked for any current City employee. In not funding the analyst/special projects position, the Council acted at least in part on the recommendation of Neudauer, who stated in a memorandum to the personnel committee, "[i]n the short time that the analyst position was functional, it did not appear that projects contemplated were of sufficient significance to justify the continuation of the position." (Blumenfeld Aff. Ex. Q.) The budget, therefore had the following effect: If the referendum were to pass, Campana's employment with the City would end April 30, 1998 but no other City employees would lose their jobs as a result of the reorganization.

During the subsequent months, Seider campaigned in favor of the proposed reorganization and Campana campaigned in opposition. On April 7, 1998, voters agreed to combine the offices of comptroller and treasurer. The next day Campana received a letter from Seider stating that her employment was "terminated effective today," but that she would be paid through April 30. (Compl.Ex. 8.) The letter instructed Campana to "absent [her]self immediately from [her] job duties" and to return her City Hall keys and any City property in her possession. (Id.) Campana was escorted from City Hall under police supervision, which according to Seider, was the custom when the City discharged employees who had access to confidential information.

### III. DISCUSSION

#### A. Title VII Claims

Campana argues that the defendants discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1). In her brief in opposition to the motion for summary judgment, Campana concedes that the claims against the individual defendants must be dismissed. *See Williams v. Banning,* 72 F.3d 552, 555 (7th Cir.1995) (an individual is not an "employer" for purposes of Title VII). Therefore, I analyze her remaining Title VII claims against the City. Campana challenges (1) the City's elimination of her position and the termination by Seider on April 8, 1998, (2) the decision to appoint Vandermeuse Finance Director instead of her and (3) her salary when compared to Vandermeuse's.[4]

As she offers no direct evidence of discrimination, I analyze her claim under the framework for assessing indirect evidence set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff bears the initial burden of making out a prima facie case of discrimination. *Id.* She must show that (1) she belongs to a protected class; (2) she was qualified for the position and/or performing satisfactorily; (3) she was discharged or suffered another adverse employment action; and (4) a similarly situated person outside the protected class was treated more favorably. *Id.* at 802, 93 S.Ct. 1817; *Kidd v. Illinois State Police,* 167 F.3d 1084, 1093 (7th Cir.1999). The "elements ... will of course vary depending on the factual context." *Id.* at 1093 n. 13.

Once the plaintiff makes this showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *Kidd,* 167 F.3d at 1093. The burden of production then returns to the plaintiff to show that the employer's legitimate, nondiscriminatory reason is pretextual. *Id.* The burden of persuasion remains with the plaintiff throughout. *Kidd,* 167 F.3d at 1093.

"A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false" will in most cases require the court to deny summary judgment. *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, if the record "conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination occurred," summary judgment is proper. *Id.* at 148, 120 S.Ct. 2097. I will address Campana's three alleged adverse employment actions separately.

**1. Elimination of her Position and Dismissal**

I assume for purposes of discussion that Campana has established a prima facie case and proceed to the second stage of the inquiry.[5] The City's burden at this

---

**4.** She also challenges the following actions: Seider's delays in approving her travel requests and his reprimanding her on April 3, 1996, Vandermeuse telling her he was "tired of her shit," telling her how to run her department, staring at her and walking behind the cash registers, and Neudauer's investigation of her argument with Vandermeuse. It is not clear from her argument if these are to be viewed as additional adverse employment actions or as evidence of discrimination relevant

to the pretext inquiry. Either way her argument fails under the pretext analysis as she has provided no evidence that these actions bore any relationship to her sex.

**5.** Campana's challenge to her discharge can be characterized in several different ways. The Council's decisions to combine the treasurer's position and not to fund the analyst/special projects position are properly characterized as "mini-RIF[s]" (reductions in

stage is a production burden only. Its articulated reasons need only be "facially nondiscriminatory." *Greenslade v. Chicago Sun–Times,* 112 F.3d 853, 864 (7th Cir. 1997).

█ The City states that it was reorganizing departments. The City had discussed how to reorganize the treasurer's office for several years. Campana herself had even suggested consolidating the treasurer's and comptroller's departments. The Council and staff had conducted surveys and considered several different organizational structures to try to save money and streamline operations. Each proposal involved combining the treasurer's office with at least one other department because the City believed that the department's staff was underutilized. The Council ultimately combined the treasurer and comptroller positions in the new finance director position and reallocated the duties of the subordinate positions. As for not funding the analyst/special projects position, the City states that there appeared to be insufficient work for one full-time position. Finally, the City says that Seider asked Campana to leave on April 8, 1998 even though her position was funded through April 30 because he wanted the reorganization to begin and her presence might impede that process. Because these reasons are not facially discriminatory, the City has met its burden of production. I move to the next stage of the analysis.

█ An employee can establish pretext by showing that "(1) [d]efendant's explana-tion had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) ... the reason stated was insufficient to warrant the [adverse job action]." *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996) (quoting *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1133 (7th Cir.1994)). "'Pretext'" does not mean a mistake; rather it means "a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). The employee must "focus on the specific reasons advanced by the defendant." *City of Fort Wayne,* 91 F.3d at 931 (quoting *Hughes v. Brown,* 20 F.3d 745, 747 (7th Cir.1994)).

Campana does not challenge the veracity of the City's statements or argue that a reorganization was an insufficient reason to remove her from her position. In her deposition testimony she implies that the City wanted to get rid of her and used the reorganization as an opportunity to do so. However, even if true, this assertion moves Campana no closer to showing that the City did not also in good faith believe that her position should be eliminated.

In addition, Campana offers absolutely no evidence that her sex was a factor. She points to disagreements with Vandermeuse and Seider, Vandermeuse's staring at her, walking behind the cash registers and telling her how to run her department. However, she has not shown that these incidents had anything to do with her sex. A reasonable jury could not find that the City's decision to dismiss Campana was

force), where a terminated employee's duties are absorbed by other employees. *See Bellaver v. Quanex Corp.,* 200 F.3d 485, 494–95 (7th Cir.2000). Seider's letter of dismissal on April 8, 1998 is properly characterized as a discharge. The method of proving the similarly situated element of the prima facie case differs for mini-RIFs and discharges. *Id.* In a mini-RIF, the similarly situated people outside the protected class are those who assume the plaintiff's duties after she is terminated, even if those employees' job titles and other duties differ from the plaintiff's. *Id.* at 495. In a discharge, the similarly situated people are those outside the protected class who have similar duties or positions but were not discharged. *Id.* Because I assume that Campana has met her prima facie cases under both analyses, I proceed to the next stage and discuss the City's asserted nondiscriminatory reasons together.

discriminatory. Thus, summary judgment is proper for this claim.

## 2. Appointing Vandermeuse Finance Director

■ Again, I assume that Campana has established a prima facie case of discrimination and proceed to the second stage of the analysis. The City asserts that it appointed Vandermeuse to be the finance director because he was more qualified. The position required someone with an accounting background; and Vandermeuse was a Certified Public Accountant. Campana was not and had no other accounting degree.

Campana argues in response that she was qualified for the position. She states that more than half of her graduate work in public administration concerned the "field of finance or public finance related areas." (Campana 4/30/01 Aff. ¶ 12.) She also states that the City included the C.P.A. requirement in the job description to intentionally exclude her. (Campana 4/30/01 Aff. ¶ 22.) But once again, Campana has offered no evidence that her sex played any role in the City's choice of Vandermeuse over her. At most, the evidence shows that Seider or the Council did not think highly of Campana. However, there is no evidence that this view was based on her gender. Campana's belief that the City crafted the job description to prevent her from qualifying is weak evidence of pretext at best. In the absence of any other evidence indicating that the City's proffered reason is pretextual, a jury could not find the City liable. Defendants' motion for summary judgment on this claim will be granted.

## 3. Wage Discrimination

■ In a wage discrimination claim under Title VII, to establish a prima facie case, plaintiff must produce evidence that she was paid less than a similarly situated male. *Johnson v. Univ. of Wisconsin–Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995). Campana compares herself to Vandermeuse as the similarly situated male. Vandermeuse's salary was between $228 and $4,803 higher than hers for the years between 1994 and 1998. To show that the two were similarly situated, she relies on the October 1994 memorandum from Neudauer in which he stated that the comptroller and treasurer had "nearly equal duties" and on the testimony of an expert witness who concluded that the two positions merited equal salaries. Again, assuming that she can meet her initial burden, I move to the second stage.

The City asserts that the comptroller had more responsibilities than the treasurer. The comptroller was responsible for the entire City budget, the information system, the general accounting system and for preparing, compiling and submitting financial reports, payroll reports and audited financial statements. The treasurer, in the City's estimation, performed lesser functions. These facially nondiscriminatory reasons satisfy the City's burden.[6]

---

6. I have assumed that Campana met her prima facie case including the fourth element that she and Vandermeuse were similarly situated. In the second stage, the City has satisfied its burden by asserting that the two positions had different responsibilities. Logically, this assertion also attacks the similarly situated element of the prima facie case in the first stage. It is unclear whether I should compare the positions' responsibilities at the first stage or second stage of the analysis. The Seventh Circuit has not yet articulated how best to analyze wage discrimination claims in cases such as this where the plaintiff and comparator do not have identical positions, *see Univ. of Wisconsin–Eau Claire*, 70 F.3d at 478 ("[i]n the wage discrimination context, neither the Supreme Court nor this Circuit has established a definitive standard"), resulting in some confusion about whether and how to fit wage discrimination cases under the burden-shifting model, *see, e.g., Ghosh v. Indiana Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1094 (7th Cir.1999) (applying the *McDonnell Douglas* burden-shifting model and analyzing

■ To establish that differences in wages were discriminatory, the plaintiff must demonstrate that the defendant intended to discriminate, that is that the disparity resulted from the City's "actual desire" to pay women less than men. *Ghosh*, 192 F.3d at 1094. To this end, Campana may offer comparative evidence; but "[c]omparative evidence is dispositive for summary judgment purposes only if it shows 'systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic.'" *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 151 (7th Cir.1996) (quoting *Loyd*, 25 F.3d at 522).

■ Campana offers the testimony of an expert witness, Steven Weigert, a vocational specialist. After reviewing the job descriptions and interviewing Campana, he concluded that the positions "seemed very similar in their level of responsibility" with the treasurer "function[ing] at a slightly higher level of responsibility." (Weigert Dep. at 74, 78.) He notes that the U.S. Department of Labor gives them the same "Specific Vocational Preparation" rating. He concludes that the positions should have received the same salaries.

Although this evidence has some probative value in determining whether the City's valuation of the two positions was accurate, it does not show that the City intended to discriminate or show that the City did not in good faith believe that the comptroller had more responsibilities meriting a higher salary. Neudauer's statement that the two positions had "nearly equal duties" likewise does not indicate that the City Council in setting the salaries did not in good faith believe that the comptroller deserved a higher salary. Because

the comparative work loads under stages two and three of the analysis); *but see, Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 525 (7th Cir.1994) (stating that "[w]hen comparing male and female remuneration in dissimilar

Campana has not shown that the City's asserted reason is pretextual, her claim must fail.

## B. Equal Pay Act Claim

■ Campana also challenges the differences in pay under the Equal Pay Act, 29 U.S.C. § 206(d)(1), which prohibits an employer from paying an employee less than he or she pays another employee of the opposite sex for equal work. The Equal Pay Act differs from Title VII in several respects. Most relevant here is that the Equal Pay Act does not require the plaintiff to show that the defendant acted with discriminatory intent. *See Varner v. Illinois State Univ.*, 226 F.3d 927, 932 (7th Cir.2000).

■ To establish a prima facie case, Campana must show "'(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions.'" *Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 548 (7th Cir.1991) (quoting *Fallon v. State of Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989)).

■ To establish the second element, the plaintiff "'must show that her job and the male employee's job involved a common core of tasks or that a significant portion of the two jobs is identical.'" *Howard v. Lear Corp. EEDS and Interiors*, 234 F.3d 1002, 1005 (7th Cir.2000) (internal citations and quotations omitted). Under this test I look to the duties actually performed by each employee, and not only to job descriptions or titles. *Soto*, 941 F.2d at 548; *Fallon*, 882 F.2d at 1208. As

jobs ... [the need to prove intent] does not allow for proof via an assumption laden scheme of prima facie cases, presumptions and rebuttals").

I stated in my June 9, 2000 decision and order, Campana can only recover for violations that occurred since February 23, 1997; therefore, I will limit my inquiry to the events that occurred after that date.

The pivotal question for Campana is whether the work did indeed require "equal skill, effort and responsibility," a question of fact. *See Howard*, 234 F.3d at 1005. The "terms equal skill, equal effort and equal responsibility 'constitute separate tests, each of which must be met in order for the equal pay standard to apply.'" *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 686 (7th Cir.1998) (citing 29 C.F.R. § 1620.14(a)). Campana's task here is sizeable given that she and Vandermeuse had very different jobs. They both headed City departments and handled City finances, but in different capacities.

To support her claim, Campana offers Weigert's testimony. The defendants' argue that Weigert's testimony is an inadmissible legal conclusion citing *West v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997). In *West* the plaintiff sought to introduce the affidavit of a criminal justice expert stating that the city defendant had negligently supervised a police officer. *Id.* The court held that this affidavit was admissible to show that the city had been negligent, but not admissible to show that the city had a policy of negligence in this regard, a question of law and a matter beyond the expert's professional competence. *Id.*

This case is inapposite. Campana's expert has testified to matters of fact, whether the comptroller and treasurer positions required equal effort, skill and responsibility. He appears competent to testify to these matters given his review of the job descriptions and his interview with Campana. Indeed courts regularly permit expert testimony in Equal Pay Act cases on this very subject. *See, e.g., Gandy v. Sullivan County*, 24 F.3d 861, 866 (6th Cir.1994); *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1018 (11th Cir.1994); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 58 (2d Cir.1993); *Thompson v. Sawyer*, 678 F.2d 257, 274 (D.C.Cir.1982); *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1174 (3d Cir.1977). Defendants' argument is without merit.

Nonetheless, summary judgment for the defendants is proper because Campana has not offered sufficient evidence from which a jury could find that she met her prima facie case. Campana cannot show that the two jobs had "a common core of tasks" or were "identical" in any way. Weigert's testimony shows that they were comparable, "counterpart" positions, but not that they were "substantially equal."[7] *See Lang*, 217 F.3d at 923 ("proof that the two jobs are of the same (or comparable) value ... gets the plaintiff [in an Equal Pay Act case] nowhere"). Indeed, Campana admits that Vandermeuse's job was plainly different.

7. Weigert's testimony is distinguishable from that of the expert in *Lang v. Kohl's Food Stores*, 217 F.3d 919, 923 (7th Cir.2000). In *Lang*, the Seventh Circuit upheld the trial court's determination that the three-page affidavit of an expert witness regarding the equality of two groups of positions was inadmissible. The Seventh Circuit found the affidavit to be merely a list of the workers' tasks gleaned from a review of the job descriptions followed by a "bald assertion" that the jobs were "substantially equal." *Id.*

Weigert's testimony, although not based on his personal observations of Campana's and Vandermeuse's actual work, is reasoned, looks to authoritative sources, and is probative of the equality of the jobs in question. Although job descriptions of two positions cannot provide definitive proof of their equality, job descriptions are evidence. *See Epstein v. Secretary of U.S. Dep't of Treasury*, 739 F.2d 274, 277 n. 6 (7th Cir.1984) ("We recognize that job descriptions may, in some instances, be highly probative of equal work").

Moreover, despite Weigert's testimony, there is no genuine issue of triable fact regarding the positions' comparative levels of responsibility. "Responsibility is concerned with the degree of accountability required in the performance of the job." 29 C.F.R. § 1620.17. Campana invested the City's funds, administered the City's property tax collection and the collection of all City fees, served as the sewer utility and ambulance billing department, maintained the cash register receipting system and recorded special billing assessments. The comptroller on the other hand, was ultimately responsible for the financial activities of the entire City. He coordinated the development of the City budget, made recommendations about what economic objectives and policies the City should pursue, forecast future expenditures and projected the City's future financial position. A jury could not find that the comptroller's responsibility for monitoring the City's overall fiscal health was substantially equal to Campana's responsibility. Plaintiff's claim must fail.[8]

## C. 42 U.S.C. § 1983

■ Next Campana raises a claim under 42 U.S.C. § 1983 alleging that the defendants deprived her of a property right in her employment without due process of law in violation of the Fourteenth Amendment. *See* U.S. Const. Amend. 14 § 1. The Fourteenth Amendment Due Process Clause provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. 14 § 1. It is well established that an employee can hold a property interest in employment, in which case, due process protections must accompany her discharge. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Bd. of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971); *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ A property interest is defined as "a legitimate claim of entitlement," more than a "desire" or "unilateral expectation." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. This interest derives not from the Constitution, but from "an independent source such as state law rules or understandings" which define its "dimensions." *Id.See also, Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)("The sufficiency of the claim of entitlement must be decided by reference to state law."). Once I determine that state law rules or understandings have created a "substantive interest," then I must look to federal constitutional law to determine whether "that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause," *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), and to determine what process is due, *Loudermill,* 470 U.S. at 541, 105 S.Ct. 1487.

### 1. Greenfield Civil Service Code

Campana points to the City of Greenfield Municipal Code ("Code") as the

---

8. Vandermeuse in his deposition states that he took on the supervision of the assessor's office in 1996. (Vandermeuse Dep. at 20–21.) Because the Equal Pay Act claim only covers pay periods since February 23, 1997, evidence that he supervised more people or took on more responsibilities in 1996 would indicate that his position was not substantially equal to Campana's and merited a higher salary. In addition, this evidence might lead me to find that Weigert's testimony based on old job descriptions was inadmissible. However, defendants have not raised these arguments in their motion for summary judgment or in any of their accompanying documents. Without evidence of the effect of this first consolidation on Vandermeuse's responsibilities, I am unable to draw any conclusions.

source of her property interest. Under the Code, every City employee is a member of either the classified or unclassified service. Greenfield, Wis., Code §§ 4.10, 4.11 (1998). Members of the classified service attain "permanent status" after six months of continuous employment with the City. Greenfield, Wis., Code § 4.11 (1998). An employee is a member of the classified service if she was a department head at the time the Code was modified, March 3, 1998. Id.

Classified service members with permanent status can only be removed according to the Code's procedures. Greenfield, Wis., Code § 4.12 (1998). If the "appointing authority" believes that a member of the classified service has "merited ... demotion or dismissal," the appointing authority "shall" submit to the City Civil Service Commission ("Commission") a written statement "setting forth specifically his/her complaint." Greenfield, Wis., Code § 4.16(1) (1998). After doing so, the appointing authority may suspend the employee. Id. The Commission must notify the employee of the complaint and provide her with a copy. Id. Then the employee has five days to request a hearing at which the Commission will determine "whether or not the charge is well-founded" and "take such action by way of suspension, demotion, discharge or reinstatement as it may deem proper." Greenfield, Wis., Code § 4.16(2) (1998).

The parties agree that the treasurer was a department head and that Campana worked for the City from 1991 to April 1998. Therefore, Campana was a department head on March 3, 1998 and a member of the classified service with permanent status. As a result, she had permanent status when the Council eliminated the treasurer position in August 1997. It is unclear what position Campana held and whether she retained her status under the Code during the months that followed. However, I will assume that Campana had permanent status during the remainder of her tenure at the City.

It is well established that a provision requiring that an employee be discharged or demoted only upon a showing of "just cause" rises to the level of a protectable property right. *See Loudermill*, 470 U.S. at 538–39, 105 S.Ct. 1487. The Greenfield Code does not use the phrase "just cause" and appears to grant City employees a slightly lesser degree of protection. However, I need not decide whether such protection rises to the level of a property right because Campana's argument fails for reasons discussed below.

### 2. The Reorganization Exception

■■■ Under Wisconsin civil service law, the state or a municipality may terminate an employee without due process if the termination is the result of a governmental reorganization. *State ex rel. Thein v. City of Milwaukee*, 229 Wis. 12, 12, 281 N.W. 653 (1938). This governmental right is known as the "reorganization exception." *Misek v. City of Chicago*, 783 F.2d 98, 100 (7th Cir.1986). *See also Castelaz v. City of Milwaukee*, 94 Wis.2d 513, 521, 289 N.W.2d 259 (1980) (civil service laws do not prevent a city or state from terminating an employee "if there are no funds available or if the position is abolished in good faith or otherwise becomes unnecessary"); *Dane County v. McCartney*, 166 Wis.2d 956, 963–64, 480 N.W.2d 830 (Ct. App.1992) (elimination of a position pursuant to a reorganization does not entitle employee to due process). Where this exception applies, it circumscribes the employee's substantive property right.

■■■ However, this exception only applies if the governmental reorganization is "legitimate." *Garrett v. Barnes*, 961 F.2d 629, 634 (7th Cir.1992). A municipality cannot "cry 'reorganization' in order to

circumvent ... constitutional and statutory protections." *Misek*, 783 F.2d at 101. Generally, an employee can attack the legitimacy of a reorganization by showing that no reorganization actually occurred, *Id.*, or that it was done in bad faith, *see Thein*, 229 Wis. at 12, 281 N.W. 653 ("Civil service laws are not to be evaded by a sham abolition of an old position for the purpose of ousting an incumbent"). There is no clear dividing line between these two avenues of attack; both attempt to show that the governmental action was motivated by improper considerations.

A number of cases have discussed factors relevant to the legitimacy of a reorganization. Where a municipality combined formerly separate positions, the Wisconsin Supreme Court looked at whether the newly created position required different qualifications, and whether employees' duties differed under the new organizational structure as compared to the old. *Thein*, 229 Wis. at 12, 281 N.W. 653. Courts in other jurisdictions have also looked at whether a position was actually abolished as opposed to simply filled by a new employee. *See Limes–Miller v. City of Chicago*, 773 F.Supp. 1130, 1140 (N.D.Ill.1991) (hiring a new employee to replace one who has been laid off is evidence of illegitimacy); *Misek*, 783 F.2d at 101 (laying off an employee without abolishing her job is evidence of illegitimacy). When a municipality reorganizes in bad faith simply to avoid civil service laws, the reorganization is also illegitimate. *See Thein*, 229 Wis. at 12, 281 N.W. 653; *Cf. Castelaz*, 94 Wis.2d at 521, 289 N.W.2d 259 (stating that a discharge pursuant to a good faith reorganization does not violate civil service laws).

■ State law may impose limitations on the extent to which an employee can challenge an alleged reorganization. *See Misek*, 783 F.2d at 101.[9] Under Wisconsin law, a reorganization carried out by a legislative body may be challenged as illegitimate, but in addressing such challenges, courts may not inquire into the motives of the legislative body. *State ex. rel. Miller v. Baxter*, 171 Wis. 193, 193, 176 N.W. 770 (1920). In *Miller*, the Wisconsin Supreme Court held that a court could not inquire into the motives of a city council in abolishing the plaintiffs' jobs despite evidence and a finding by the trial court that the council had passed the ordinance in order to avoid a "for cause" requirement. *Id. See also Banach v. City of Milwaukee*, 31 Wis.2d 320, 327, 143 N.W.2d 13 (1966) ("the motives of a common council or other municipal body performing a legislative function may not be inquired into on judicial review") (citing *S.D. Realty Co. v. Sewerage*

---

**9.** In *Misek*, the Seventh Circuit held that as a matter of Illinois civil service law, employees cannot challenge a reorganization based on the bad faith of the municipality. 783 F.2d at 101. Some courts have misinterpreted *Misek* by suggesting that federal constitutional law rather than state law precludes an inquiry into the motives of a municipal government. *See, e.g., Conroy v. City of Chicago*, 708 F.Supp. 927, 944 (N.D.Ill.1989); *Conine v. City of Marinette*, No. 94–0933, 1994 WL 592188, slip. op. at 2 (Wis.Ct.App. Nov. 1, 1994).

In *Misek*, the City of Chicago asserted that a department had reorganized resulting in the summary dismissal of the plaintiffs. 783 F.2d at 100. The questions before the Seventh Circuit were whether the reorganization exception applied and the grounds on which the plaintiffs could challenge the reorganization questions of Illinois civil service law. *Id.* The court held that Illinois law recognized a reorganization exception but did not permit an employee to attack an alleged reorganization on the ground that it was motivated by bad faith. *Id.* (citing *Fitzsimmons v. O'Neill*, 214 Ill. 494, 503, 73 N.E. 797 (1905); *Chestnut v. Lodge*, 34 Ill.2d 567, 571, 216 N.E.2d 799 (1966); *Thomas v. City of Springfield Civil Serv. Comm'n*, 106 Ill.App.3d 939, 942, 62 Ill.Dec. 726, 436 N.E.2d 752 (1982)). This holding is not applicable here.

*Comm.*, 15 Wis.2d 15, 30, 112 N.W.2d 177 (1961); *Jackson v. City of Madison* 12 Wis.2d 359, 364, 107 N.W.2d 164 (1961); *Wagner v. City of Milwaukee*, 180 Wis. 640, 645, 192 N.W. 994 (1923); *Tilly v. Mitchell & Lewis Co.*, 121 Wis. 1, 10–12, 98 N.W. 969 (1904)); *MTW, Inc. v. City of Milwaukee*, 327 F.Supp. 990, 992 (E.D.Wis.1971) ("ordinance which is valid on its face may not be condemned by the court because a legislative committee may have expressed an unworthy purpose in furthering its adoption"). Thus, under Wisconsin law when a reorganization is established by legislative act, courts can only inquire into whether the reorganization actually occurred.

■ In the present case, there is no question that the reorganization was carried out by the city council and thus was a legislative act. Therefore, in assessing whether it was legitimate, I may not inquire into the council's motives, but am limited to determining whether it actually occurred. The undisputed evidence shows that the reorganization in Greenfield actually occurred, and therefore was legitimate. The City did in fact reallocate job assignments and shift staff. Rather than replace Campana with someone new, the City created a new position, the finance director. The qualifications for this position differed from the qualifications for the old treasurer position. The finance director position required someone with an accounting background. The treasurer position made accounting experience a preference, but not a requirement.

The duties of the comptroller, treasurer and finance director differed. In short, the finance director was responsible for the duties of both of the old positions. The finance director supervised a staff of twice as many people as the treasurer. He prepared the City's annual budget, assisted all City departments in managing their own budgets, managed the City's payroll, managed all invoices and receipts, and managed the assessor's office. None of these were duties performed by the treasurer.

As for the analyst/special projects position, the Council effectively abolished it by choosing not to fund it. No new employee was hired or existing staff transferred to fill it.

Finally, the Council's actions with regard to Campana's positions occurred as part of a larger restructuring of City departments. The Council and City administrators had discussed consolidating the departments for four years. Indeed, Campana had suggested consolidation. The City conducted studies and considered several possible structures before the Council voted. The non-funding of the analyst/special projects position appears to be part of the same process of change.

Because Greenfield's reorganization of departments was legitimate, the reorganization exception applies.[10] Thus Campana lost her job as a result of a reorganization, and was entitled to no hearing. The City did not deprive her of a property right in violation of due process.

■ Campana makes much of the fact that under the structure approved by the Council in August 1997, no one would have lost his or her job. Indeed, "mutually explicit understandings" even in the absence of contractual provisions or statutory entitlements can supply a property interest. *See Perry*, 408 U.S. at 601, 92 S.Ct. 2694. However, even if this promise of a position

---

**10.** No Wisconsin court has interpreted the precise language of the Greenfield Municipal Code; however, Wisconsin courts have unanimously recognized the reorganization exception in interpreting the civil service laws of the state and other municipalities. I see no reason to find that this exception would not apply here.

under the new structure gave Campana a property interest, no evidence indicates that the City's November decision not to fund the analyst/special projects position was illegitimate. Unlike the Council's August decision to consolidate departments, the November decision targeted only one employee. This fact makes the decision look less like a legitimate reorganization and more like a summary dismissal. However, because I cannot consider whether the Council acted in bad faith and because the Council eliminated the position entirely, rather than replacing Campana with a different employee, the reorganization exception applies. Campana's due process claim against the defendants based on the actions of the Council must fail.[11]

### 3. Seider's Demand that Campana Leave on April 8, 1998

Campana also argues that Seider's April 8, 1998 letter demanding that she immediately leave her position deprived her of a property right without due process. After the Council passed the two ordinances

eliminating her positions, I will assume that Campana maintained a property right in her employment. However, for the reasons discussed above, her right lasted only through April 30, 1998 when the funding for the position would end. *See also Roth,* 408 U.S. at 578, 92 S.Ct. 2701 (property right in employment ended when employment contract expired). The parties do not dispute that Campana received her full salary and benefits through April 30. Therefore, if Seider's action was a deprivation, it was only a deprivation of twenty-two days work, not pay.

"[T]o be actionable under the due process clause, the deprivation of a public employee's property interest in continued employment must be more than *de minimus.*" *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 530 (7th Cir.2000) (noting *de minimus* exception where plaintiff was discharged two years and four months before contract would have ended but paid full salary for duration). *Accord Head v. Chicago Sch. Reform Bd. of Trustees,* 225 F.3d 794, 803

---

11. Another line of cases may also apply here. Where a property right derives from positive law and the legislature amends the law so as to revoke the property right, the party has no more property right upon which to base a due process challenge. *See Shegog v. Bd. of Educ. of the City of Chicago,* 194 F.3d 836, 837 (7th Cir.1999)("[w]hen tenure is simply an outcome of a statute requiring cause for discharge, it disappears when the statute is amended"). In these instances, the legislative process itself provides all the process that is due under the Due Process Clause. *See Atkins v. Parker,* 472 U.S. 115, 129–30, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432–433, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)). However, this principle holds true only if the legislature's action was legislative in nature, as opposed to adjudicative. *See Club Misty, Inc. v. Laski,* 208 F.3d 615, 622 (7th Cir. 2000). If it was adjudicative, more procedural protections are required. *Id.*

"[T]he character of the proceedings" determines whether the action is legislative or ad-

judicative, not the "character of the body" making the decision. *Id.* (finding voter referendum adjudicative where voters could vote to remove one particular tavern's liquor license). *Cf. L.C. & S., Inc. v. Warren County Area Plan Comm'n,* 244 F.3d 601, 605 (7th Cir.2001) (finding amendment to zoning ordinance to prohibit all new liquor licenses legislative because generally applicable despite evidence that decision was aimed at preventing one particular tavern from opening). Although the distinction between legislation and adjudication is far from clear, as a general rule legislation operates prospectively and applies generally whereas adjudication "enforces liabilities as they stand on present or past facts." *Club Misty,* 208 F.3d at 622.

Whether Campana's discharge was adjudicative as opposed to legislative likely depends upon many of the same factors relevant to the question of whether the reorganization was legitimate. However, the parties have not addressed this issue and I need not either.

(7th Cir.2000) (same where plaintiff was discharged eleven months before contract would have ended but paid full salary for duration); *Swick v. City of Chicago,* 11 F.3d 85, 87 (7th Cir.1993) (same where plaintiff was required to take one-year involuntary sick leave but paid full salary for duration).

 Property in the due process context includes only things having "measurable economic value," not the "purely dignitary or otherwise nonpecuniary dimensions of employment." *Swick,* 11 F.3d at 87. The Seventh Circuit has stated that loss of reputation, professional satisfaction, health or personal relationships are not property, *Bordelon,* 233 F.3d at 530, but indirect effects on future job opportunities or other pecuniary benefits that an employee would have received had she remained in the position may be, *Head,* 225 F.3d at 803. Therefore, to prevail, Campana must "show some economic loss from [Seider's] actions, or at least establish an identifiable impact on [her] future income or economic benefits." *Bordelon,* 233 F.3d at 530.

 The evidence indicates that Campana's dismissal twenty-two days before her property interest ended worked no actionable deprivation of property under the Due Process Clause. No evidence indicates that her slightly early dismissal deprived her of any economic interest or had any identifiable impact on her future earnings. Although Seider's letter and the police escort caused her embarrassment and may or may not have been appropriate under the circumstances, the property component of the Due Process Clause provides her no remedy for these harms. The defendants are entitled to summary judgment on this claim.

Now, therefore

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is granted and this case is dismissed.